A96A0885. POPE et al. v. GOODGAME.
(478 SE2d 636)

ANDREWS, Judge.

Shirley Pope and James Gillis, children of Nancy Gillis and administrators of her estate, appeal from the judgment entered on the jury's verdict in favor of defendant James Goodgame, a radiation physicist.[1] We affirm.

1. Construing the evidence so as to support the jury verdict,

---

[1] See *Gillis v. Goodgame*, 262 Ga. 117 (414 SE2d 197) (1992), reversing *Gillis v. Goodgame*, 199 Ga. App. 413 (404 SE2d 815) (1991) (concluding that a radiological physicist is not one of the professions covered by the affidavit requirement of OCGA § 9-11-9.1). Nancy Gillis died before trial of this case, and her son and daughter were substituted for her as plaintiffs. Prior to trial, claims against Dr. Smith, his professional association, and the manufacturer of the machine used in the treatment were settled. Only the claim against Goodgame was tried.

*Mattox v. MARTA*, 200 Ga. App. 697 (1) (409 SE2d 267) (1991), it was that Nancy Gillis suffered from breast cancer for which she underwent a mastectomy by Dr. Morgan in March 1987. Dr. Morgan then referred her to Dr. Smith, a radiologist, who advised her to undergo radiation therapy of the chest wall. She underwent 25 treatments from May 21 through June 24, 1987.

Goodgame began working with Dr. Smith and his partners in 1985 as a radiation physicist. Dr. Smith's professional association and Goodgame had an agreement that the "radiation physics would be handled by [Goodgame] as a consultant radiation physicist, not as an employee." Goodgame had a master's degree in physics, had done a Public Health Service fellowship, received a certificate in radiation physics from Emory University, and completed all of his work for his Ph.D. in physics except for his dissertation. For Radiology Services, Dr. Smith and the other doctors' professional association, Goodgame was responsible for calibrating the cobalt machine used in the radiation therapy, i.e., measuring how much radiation the cobalt was producing. While the strength of the cobalt could not be controlled, the time of exposure to the radiation could. Goodgame charged a basic dosimetry charge of $40 for the initial calculations performed when the patient began treatment and then a "continuing physics" charge of $35 for his bi-weekly review of the patient's chart. The billing of insurance was done by the administrative secretary for the doctors, and Goodgame received 85 percent of amounts collected for these two charges. The remaining 15 percent was a fee for processing the charges and insurance.

Goodgame's job was to make the calculations to ensure that the dosage prescribed by the doctor was delivered by the cobalt machine at the depth prescribed by the doctor. For this purpose, Goodgame had developed a computer program which he used to calculate treatment time. The machine used for the treatment of Gillis was an El Dorado 8 cobalt machine, in which Goodgame owned no interest.

Dr. Smith's prescription for Gillis was 5,000 rads (radiation absorbed dose) given by anterior port, with an axillary boost (treatment of the underarm area from the back). The rads were delivered from the front to the chest in the clavicle area. Because the armpit area is thicker, in order for there to be a homogenous dose of 5,000 "you've got to give more entrance dose to get the lower part of the deeper part of the axilla up to the surface dose." According to Dr. Smith, the radiation physicist would calculate how much radiation was being given from the anterior port and then determine what boost was needed for the axilla. The 5,000 rads was an accumulated dose, achieved by adding 200 rads a day.

After a few weeks of treatment, Gillis had developed a sore under her arm. Since the treatment was nearing an end, it was deter-

mined that it should continue, and the sore resolved itself over several weeks. After the treatments ended, Gillis began to have shortness of breath and eventually was hospitalized with pneumonia. In October 1987, she was diagnosed with radiation pneumonitis. She died in 1991, and the cause of death was listed as aspergillus (fungal infection), cystic degeneration and radiation pneumonitis.

It was alleged that Gillis "died as a result of the negligence of James Goodgame." In the pretrial order the claim is that Goodgame "negligently conducted and directed radiation therapy on Nancy Gillis."

2. The first enumeration is that the court erred in not submitting to the jury and giving requested charges on the issue of joint venture or partnership regarding the radiation treatment of Gillis.

(a) Based on the description of his job as given by Goodgame and verified by Dr. Smith, the radiologist, and pretermitting the fact that it would be illegal for him to do so, Goodgame was not practicing medicine. *Gillis v. Goodgame*, 262 Ga. at 117; *Doctors Hosp. &c. v. Bonner*, 195 Ga. App. 152, 155 (1) (392 SE2d 897) (1990). Therefore, there could be no basis for submitting to the jury the issue of joint venture or partnership with regard to the medical decisions made in the treatment of Gillis, including the recommendation to undergo radiation treatment.

(b) Gillis' own experts, Dr. Spanos (radiation oncologist) and Dr. Ross, opined that Gillis was not an appropriate candidate for radiation therapy, a decision in which Goodgame did not participate. Neither had an opinion that, once the decision was made to administer radiation therapy, it was done in an inappropriate manner. According to Dr. Spanos, nothing that Goodgame did or did not do caused the radiation pneumonitis of Gillis.

(c) Apparently, plaintiffs contend that, because there was a business relationship between the doctors and Goodgame, the joint venture/partnership issue still should have been submitted to the jury.

"A joint venture or undertaking for profit occurs when there exist rights of mutual control as to the conduct of the various members of the enterprise. [Cits.]" *Time Financial Svcs. v. Hewitt*, 139 Ga. App. 270, 272 (228 SE2d 176) (1976).

There was no showing made that there was any error in the calculations made by Goodgame for the treatment of Gillis or in the calibration of the machine. In fact, the evidence was that the calculations and calibrations were correct and that Gillis did get the dose prescribed. As to the business relationship, there was no showing that Goodgame controlled in any way the conduct of the doctors or that they in any way controlled his calculations and calibrations. The mere existence of a business interdependency does not create a joint venture. *Davenport v. Oglethorpe Power Corp.*, 196 Ga. App. 632 (396

SE2d 580) (1990); *Ga. Pacific Corp. v. First Nat. Bank &c.*, 147 Ga. App. 292 (248 SE2d 554) (1978); *Time Financial Svcs. v. Hewitt*, 139 Ga. App. at 272 (2), (3).

There was no error.

3. The second enumeration is that the court erred in its charge on causation.

(a) Although plaintiffs argue here that causation was not an issue at the trial, the trial record reflects that plaintiffs' action was grounded in negligence, a charge was requested by plaintiffs on proximate cause, and the issues designated by plaintiffs to be decided by the jury included proximate cause. They will not be heard here to contend otherwise.

(b) The objection voiced below was that, in the proximate cause charge, "the Court said that the negligence must have caused the injury, without going further and saying that it could be caused in whole or in part, and we feel that was confusing. Also, . . . there was a statement made that a slight connection would not be sufficient for proximate cause. We feel also that would exclude the possibility of the jury finding that Mr. Goodgame is only partially liable or a contributory cause. . . . The Court, in that charge, made a statement that the issue was whether the conduct is so remote as to be unfair for the Court to hold the defendant liable. . . . Fairness is not necessarily the legal standard for proximate cause."

Plaintiffs requested the court to give the "standard pattern charges on negligence, proximate cause. . . ." We have reviewed the charge as given by the court as a whole and find that, although not verbatim the standard pattern charge,[2] it covered all the required elements as requested by plaintiffs and was not in error as alleged.

(c) Several other alleged errors in the charge are presented here for the first time.

"A party may not complain of the giving or failure to give an instruction to the jury unless he objects to the instruction before the jury returns its verdict, stating distinctly his objection and the grounds of his objection. OCGA § 5-5-24 (a). Failure to except before verdict generally results in a waiver of any defects in the charge (cit.), the exception [being] a substantial error which was blatantly apparent and prejudicial, and which resulted in a gross miscarriage of justice. [Cits.]" (Punctuation omitted.) *Hayden v. Sigari*, 220 Ga. App. 6, 11 (6) (467 SE2d 590) (1996). We find no such error.

4. The charge given by the court on "preponderance of the evidence" was not error as contended in the third enumeration. The charge, as a whole, adequately explained the burden of proof and did

---

[2] Suggested Pattern Jury Instructions, Vol. I: Civil Cases, 3rd ed., p. 231 et seq.

not improperly shift it as argued by plaintiffs. See *Rayburn v. Dempsey*, 217 Ga. App. 255, 257 (2) (457 SE2d 220) (1995).

5. Plaintiffs contend that failure to give their requested charge on alteration of medical records based on OCGA § 16-10-94.1 was error and mandates a new trial.

There was no showing made of any improper alteration of medical records which would support the giving of such a charge.

6. Plaintiffs' fifth enumeration complains of the court's grant of summary judgment to Goodgame with regard to their assertion of a wrongful death claim.

(a) Summary judgment was not granted to Goodgame, however. The court did, by order of January 5, 1995, grant Goodgame's motion to dismiss the wrongful death claim because it had been asserted by non-parties beyond the statute of limitation. Regardless of nomenclature, we consider the enumeration. See *Hosley v. Davidson*, 211 Ga. App. 529, 533 (3) (439 SE2d 742) (1993).

(b) By order of October 13, 1992, the motion of Gillis and Pope to be substituted as plaintiffs as co-administrators of Nancy Gillis' estate was granted. On September 22, 1994, an amended complaint was filed by them in their individual capacities, alleging wrongful death. Goodgame's motion to dismiss based on expiration of the statute of limitation was granted.

The substitution of Gillis and Pope as personal representatives of Gillis was done pursuant to OCGA § 9-11-25 (a) and involved Gillis' surviving negligence claim against Goodgame. See OCGA §§ 9-2-40; 9-2-41. This does not result in addition of a new party or a new cause of action to the litigation. *Chaffin v. Chaffin*, 207 Ga. 36, 37 (59 SE2d 911) (1950).

The wrongful death claim, on the other hand, is a claim belonging to, in this case, the surviving children of the deceased for "the full value of the life of the decedent." OCGA § 51-4-2. It is not addressed to the injuries suffered by the decedent prior to death, but to the injury suffered by the beneficiaries resulting from the death of the decedent. *Lovett v. Garvin*, 232 Ga. 747, 748 (208 SE2d 838) (1974); see *Miles v. Ashland Chemical Co.*, 261 Ga. 726 (410 SE2d 290) (1991).

Therefore, the trial court properly concluded that the attempt to add these parties and this claim to the ongoing litigation was one which required an order of the court, which had not been granted, and was attempted beyond the statute of limitation. OCGA §§ 9-3-33; 9-11-19; 9-11-20; 9-11-21.

There was no error.

*Judgment affirmed. Pope, P. J., and Smith, J., concur.*

*Sutton & Associates, Berrien L. Sutton, Ronald W. Hallman,* for appellants.

*Beckmann & Pinson, Walter W. Ballew III,* for appellee.